**TEXAS EMPLOYERS INSURANCE ASSOCIATION, Appellant,**

v.

**Mary Lou MITCHUSSON, Appellee.**

**No. 4712.**

Court of Civil Appeals of Texas, Eastland.

Sept. 13, 1974.

Burford, Ryburn & Ford, James H. Holmes III, Dallas, for appellant.

Kennedy & Minshew, Jack G. Kennedy, Sherman, for appellee.

WALTER, Justice.

Mary Lou Mitchusson, Michael J. Mitchusson, and Patsy Ann Mitchusson recovered full death benefits under the Workmen's Compensation Law against Texas Employers Insurance Association and the Association has appealed.

The jury found that Claude W. Mitchusson sustained a strain or exertion as a result of his work activity on the 21st day of July, 1972 in the course of his employment which was a producing cause of his death.

The court properly refused to submit Texas Employers Insurance Association's sole cause issue because it was an inferential rebuttal issue. The recent amendment to Rule 277, Texas Rules of Civil Procedure, provides, in part, that "inferential rebuttal issues shall not be submitted."

The deceased's widow, Mary Lou Mitchusson testified substantially as follows:

My name is Mary Lou Mitchusson and I live in Sherman. My husband had been working for Continental Battery Company prior to his death.

In March 1971 my husband had open heart surgery, that is he had the aorta valve replaced, and was off work for about six months. He returned to work for Continental Battery Company in August of 1971. On July 21, 1972, which was a Friday at about 7:00 in the evening, I saw my husband when he came home from work. This was about the usual time he would return. When he came home that evening, he was complaining about being tried and exhausted and his arm was hurting him and he was sweaty and dirty. The next day he went to visit a friend and slept most of the afternoon. He retired about 8:00 p. m. on Saturday evening and got up about 9:00 a. m. on Sunday morning. He just sat

around the house and drank coffee. He was sitting on the couch putting a cord on an electric clock and taking it off and putting it back on and he was just sitting on the couch and all of a sudden he leaned back. I called the ambulance and Dr. John Hardy. My husband was taken to the hospital. She was asked, "Would you tell the jury the condition that this left Mr. Mitchusson in?" She answered, "He had no use of his right arm or his right leg. He was able to kind of shuffle along by holding onto your arm. He couldn't raise his foot up; just kind of shuffled it, but he had no use of his arm at all, and his ability to say the right terminology to say a word; he didn't have that. He couldn't think of the proper word to say."

From the time my husband came home from work on Friday the 21st until he had his stroke on the 23rd, he didn't engage in any type of strenuous activity, and from the time of his stroke until his death on August 26, he was not able to communicate with the doctors or the family very well. On August 26, 1972, my husband was sitting on the couch going to lay down and I heard the couch springs make a noise. My husband had tried to get up and had fallen and when I went in there he was all drawn back and bent up. This was on a Saturday. I called the ambulance immediately and he was taken to the hospital and shortly thereafter was pronounced dead.

Barry Lee Little testified substantially as follows:

I formerly worked for Continental Battery Company and I knew Claude W. Mitchusson during his lifetime. He also worked for Continental. He made city deliveries and I think he was an assistant to Mike L. Aly in the office. When I first went to work for the company, I do not believe it was his normal duty to load batteries but about 4 or 5 weeks before July 21st, Mitch began loading batteries. The batteries were unloaded and loaded on Friday. On this particular Friday they started unloading the trucks at about 11:30 in the morning. Worked awhile and took off for lunch and finished unloading about 1:30 p. m. They began loading the trucks with batteries and finished around 4:00 p. m. Mitch was working out there from the time they started until they finished.

On an average I would have about 45 or 50 junk batteries. They would unload the junk batteries and load the truck with the new batteries. I would average loading out around 140 to 150 batteries a week. I believe it ran higher in the month of July, 1972. A battery would weigh on an average of about 40 pounds. We load from the side of the truck. We had a platform and then there is a three foot ledge were the batteries were handed down and put on the truck. The batteries were carried by hand and loaded in the truck.

Claude W. Mitchusson loaded batteries on my truck on July 21, 1972. July 21, 1972 was a hot day.

He was asked the following question and he gave the following answer:

"Q So, in other words, it required him to either lift them up high and put them in, or to put them down low, or to put them in straight in the center; is that correct, several levels?

A Yes, sir."

Mike L. Aly testified substantially as follows:

I was working for Continental Battery Company in July of 1972 and I knew Claude W. Mitchusson when I worked there. When he returned to work after his open heart surgery, he worked with me in the office. About 6 or 8 weeks before he left work the last time, he was in charge of loading the trucks on Friday. He actually helped in loading and unloading the trucks. After he worked

unloading and loading the trucks with batteries, he was usually wet from the waist up and he would say he was given out.

Dr. John M. Hardy testified substantially as follows:

I have had many heart pateints in my 43 years of practice. I was the family physician for the Mitchussons and treated Mr. Mitchusson on July 23, 1972 and at the time of his death on August 26, 1972. My diagnosis of what occurred to Mr. Mitchusson on July 23, 1972 was that he suffered a cerebral vascular accident due to an embolus.

". . . and by embolus I mean a small clot turning loose and lodging in one of the small vessels in the vein and causing certain damage which wound up as a paralysis of his right arm and right leg."

Many of these clots dislodge at the time of the accident but not always. They can dislodge several days later. In my opinion Mr. Mitchusson had severe arteriosclerotic heart disease. In my opinion the cause of Mr. Mitchusson's death was a massive cornonary infarction.

The doctor was asked the following questions and he gave the following answers:

"Q All right, Doctor, do you have an opinion based upon reasonable medical certainty as to whether the strains or exertions that Mr. Mitchusson undertook that I have described to you that he had the strain and exertion of loading and unloading the batteries on July 21st, 1972, was producing cause or produced the myocardial infarction, or contributed to it from which he died on August the 26th, 1972?

A Yes.

Q What is that opinion, please?

A My opinion is that the heart was further damaged by the exertion done in July, and did not fully recover causing more bloodclots to form with eventual blocking the main arteries to the heart with rather sudden death.

Q All right. Broken down in layman's terms, perhaps, I need to ask it a different way. Are you of the opinion that the strains and exertions contributed to or caused the myocardial infarction on August 26th, 1972?

A Yes."

■ We find some evidence of probative force to support the jury's answers that Mr. Mitchusson sustained strain or exertion as a result of his work activity on the 21st day of July 1972, and that such strain or exertion was suffered by him in the course of his employment with the Continental Battery Company and that such strain or exertion was a producing cause of Mr. Mitchusson's death. Baird v. Texas Employers' Insurance Association, 495 S.W.2d 207 (Tex.Sup.1973).

We have considered the entire record and hold that such findings set forth in the preceding paragraph were not based upon insufficient evidence and are not against the overwhelming weight and preponderance of the evidence. In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951).

■ Dr. Hardy was permitted to testify that Mr. Mitchusson suffered a stroke as a result of strain or exertion on July 21, 1972, which was connected with and contributed to the heart attack of August 26, 1972. Appellant objected to such testimony because there were no pleadings that he suffered a stroke. We hold that any error, if any, in admitting such testimony was harmless. Rule 434, T.R.C.P.

We have considered all of appellant's points and find no merit in them. They are overruled. The judgment is affirmed.